IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              CRIMINAL ACTION NO. 2:17-cr-00010

CHARLES YORK WALKER, JR.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

The court must decide whether, under Rule 11 of the Federal Rules of Criminal Procedure, to accept or reject the plea agreement between the defendant, Mr. Charles York Walker, and the government. While Rule 11 gives defendants and prosecutors the ability to enter into plea agreements, it also obligates judges to accept or reject those agreements.[1] Rule 11 is silent on what the court should or may consider in its decision.

It is the court's function to prevent the transfer of criminal adjudications from the public arena to the prosecutor's office for the purpose of expediency at the price of confidence in and effectiveness of the criminal justice system. The community of the Southern District of West Virginia must not be systemically excluded from its proper place in this participatory democracy, especially with regard to the heroin and

---

[1] Fed. R. Crim. P. 11.

opioid crisis. Because I **FIND** that the plea agreement proffered in this case is not in the public interest, I **REJECT** it.

## II. BACKGROUND

### a. Factual Background

On September 13, 2016, the grand jury in the Southern District of West Virginia returned an indictment against the defendant in case number 2:16-cr-174-1.[2] The indictment charged the defendant with three counts of distributing a quantity of heroin in violation of 21 U.S.C. § 841(a)(1); two counts of distributing a quantity of fentanyl in violation of 21 U.S.C. § 841(a)(1); and one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[3] The charged conduct occurred between April 14, 2016, and July 14, 2016.[4]

The defendant and the government later entered into a plea agreement. The defendant agreed to plead guilty to a separate, single-count information, and the government agreed to move this court to dismiss the grand jury indictment.[5] On January 23, 2017, the single-count information was filed against the defendant in case number 2:17-cr-10. The information charged Mr. Walker with a single count of possession with intent to distribute a quantity of heroin on July 14, 2016, in violation of 21 U.S.C. § 841(a)(1).[6] On January 26, 2017, the defendant pled guilty to that

---

[2] *See* Indictment, No. 2:16-cr-174-1 [ECF No. 18].

[3] *Id.*

[4] *Id.*

[5] Plea Agreement, No. 2:17-cr-10 [ECF No. 9].

[6] Information, No. 2:17-cr-10 [ECF No. 1].

information.[7] Although I accepted the defendant's guilty plea, I deferred acceptance of the parties' plea agreement until I reviewed the presentence investigation report.[8] I have done so.

During the presentence investigation, a number of troubling facts regarding Mr. Walker's criminal history and the criminal conduct at issue emerged. First, Mr. Walker is intimately familiar with the criminal justice system. At age thirteen, Mr. Walker broke into an apartment and stole jewelry, a radio, and a Nintendo gaming set. Although he was charged with aggravated burglary and theft, Mr. Walker was ultimately convicted of burglary and sentenced to twelve months probation. From ages fourteen to seventeen, Mr. Walker was convicted of six more theft-related crimes. As an adult, Mr. Walker has been convicted eighteen additional times. His convictions include: possession of a controlled substance, carrying a concealed weapon without a permit, wanton endangerment, possession of cocaine base with intent to distribute, possession of crack cocaine, felon in possession of a firearm, disorderly conduct, three no operator's license convictions, reckless operation of a vehicle, speeding, seatbelt violation, three driving under suspension convictions, and driving under the influence. Mr. Walker also has eight pending charges, one of which is a domestic battery charge. Additionally, forty-seven other charges against Mr. Walker since the time he was thirteen were either dismissed, dropped, or have an unknown disposition. Despite his very lengthy criminal history, courts and

---

[7] Written Plea, No. 2:17-cr-10 [ECF No. 8].

[8] Tr. Proceedings 24:3–4, No. 2:17-cr-10 [ECF No. 11].

prosecutors have repeatedly given him leniency. In the twenty years since Mr. Walker turned eighteen, he served approximately 7.8 years in prison, most of which was the five-year sentence imposed for a single drug conviction in 1998.

For most of his life, Mr. Walker has been involved with illicit drugs. He began using marijuana at age twelve, cocaine at age thirteen, alcohol at age twenty, PCP at age twenty-six, pills such as Subutex, Roxicodone, and Xanax around age twenty-six, and heroin at age thirty. He admitted that he continued to use marijuana, cocaine, alcohol, pills, and heroin through the time of his arrest for this matter. Additionally, there is evidence to suggest that Mr. Walker mixed violence and threats of violence with his criminal drug and firearm activity. Cory Corns, an individual interviewed by the Metropolitan Drug Enforcement Network Team ("MDENT"), stated that Mr. Walker accused him of stealing heroin and money, and pistol-whipped him and his seventeen-year-old roommate. William Ennis, Cory Corns's roommate, also stated that he had been pistol-whipped by Mr. Walker.

In addition to Mr. Walker's voluminous criminal history, the particular facts of this case trouble me. Beginning on April 12, 2016, confidential informants ("CIs") working with MDENT conducted seven controlled buys from the defendant over the course of several months. During each of the controlled buys, the CIs purchased heroin, fentanyl, or a mixture of the two drugs. In total, Mr. Walker sold 0.729 grams of heroin, 0.071 grams of fentanyl, and 0.17 grams of a furanyl fentanyl and heroin mixture to the CIs. On July 12, 2016, during the last controlled buy, Mr. Walker told the CI that some of Mr. Walker's other purchasers had recently overdosed and

warned the CI to use cautiously. It appears Mr. Walker was engaged in a continuing drug dealing enterprise. Based on the controlled buys, MDENT agents obtained an arrest warrant for the defendant and a search warrant for the apartment from which the defendant sold heroin on July 12, 2016.

On July 14, 2016, MDENT agents executed the warrants. The agents arrested the defendant as he entered a vehicle. The agents searched the defendant incident to arrest and discovered 9.7 grams of marijuana, 2.081 grams of powder cocaine, and 0.845 grams of a heroin and fentanyl mixture. The agents then executed the search warrant and recovered a set of digital scales, one bag of a white substance, one Newport box with a suspected methamphetamine pipe, one bag of suspected marijuana, five boxes of 0.45 caliber ammunition, two pistols, miscellaneous medical items containing the defendant's name, and the cell phone used during the controlled buys.

### b. Rule 11 of the Federal Rules of Criminal Procedure

Rule 11 of the Federal Rules of Criminal Procedure grants a district judge the power to accept or reject a plea agreement.[9] The court enjoys "broad discretion . . . when choosing to accept or reject plea agreements"[10] and "is not obligated to accept any recommendation or bargain reached by the parties."[11] The Advisory Committee

---

[9] Fed. R. Crim. P. 11(c). Congress, by virtue of the Rules Enabling Act and adoption of the Federal Rules of Criminal Procedure, has sanctioned the judge's power to accept or reject a plea agreement. *See* 28 U.S.C. § 2072; *see also* 1 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2 (4th ed. 2017) ("Congress . . . always retains the authority to approve, disapprove, or modify any proposed new rules or rule changes.").

[10] *In re Morgan*, 506 F.3d 705, 708 (9th Cir. 2007).

[11] *United States v. Dixon*, 504 F.2d 69, 72 (3rd Cir. 1974).

Notes to Rule 11 expressly state: "The plea agreement procedure does not attempt to define criteria for the acceptance or rejection of a plea agreement. Such a decision is left to the discretion of the individual trial judge."[12] Other than granting the court broad discretion to accept or reject a plea agreement, Rule 11 provides no further guidance for the court.

### c. Cultural Context

The plea agreement proffered by the parties in this case was made in the context of a clear, present, and deadly heroin and opioid crisis in this community. West Virginia is ground zero.

#### i. The Heroin & Opioid Crisis

The heroin and opioid crisis is a cancer that has grown and metastasized in the body politic of the United States. Heroin and opioids are different from other addictive substances.[13] The principal difference lies in the fact that recreational use is too often deadly. The questionable level of potency in each dose of heroin frequently causes overdose.[14] All too often news stories emerge of "bad batches" that cause a deluge of fatal overdoses.[15] Furthermore, users develop a tolerance over time and, as

---

[12] Fed. R. Crim. P. 11 advisory committee's note to 1974 amendments.

[13] I recognize that heroin is a kind of opioid. For clarity, I will reference heroin and opioids separately.

[14] *See infra* note 26; *see also* Audrey Redford, *Still Searching for the Tzutzu Flower: Cautions Against Extending the Federal Analogue Act of 1986*, 27 U. Fla. J.L. & Pub. Pol'y 111, 119 (2016) (stating some heroin overdoses occur because the varying presence of fentanyl renders users unaware of the drug's true potency).

[15] *See, e.g.*, Steve Birr, *"Bad Batch" of Heroin Sparks Five Overdoses in Four Hours*, The Daily Caller News Found (Dec. 28, 2016, 3:08 PM), http://dailycaller.com/2016/12/28/bad-batch-of-heroin-sparks-five-overdoses-in-four-hours/; Carolyn Blackburne, *"Bad Batch" of Heroin is Causing Record Amount of Overdoses in Washington County*, http://www.your4state.com/news/news/bad-batch-of-heroin-is-causing-record-amount-of-overdoses-in-washington-county (last visited June 23, 2017). Jeremy Gorner et al., *74 Overdoses in 72 Hours: Laced Heroin May Be to Blame*, Chi. Trib. (Oct. 2, 2015, 10:11

a result, seek out the highest potency possible without regard to the related risk of death. The Centers for Disease Control and Prevention ("CDC") found that between 2012 and 2014, heroin caused the most overdose deaths of any drug.[16]

Heroin use has increased across the United States in all genders, in most age groups, and in all income levels.[17] "Some of the greatest increases [have] occurred in demographic groups with historically low rates of heroin use: women, the privately insured, and people with higher incomes."[18] It is estimated that 580 people initiate heroin use each day.[19] This rapid increase in heroin use has had deadly consequences. Between 2002 and 2013, the rate of heroin-related overdose deaths per 100,000 people increased 286%.[20] The number of drug overdoses involving heroin tripled from 2010 to 2014.[21] In 2015, heroin caused 12,989 deaths.[22] Heroin arrests by the Drug Enforcement Administration ("DEA") increased at the fastest annual average rate from 2002 to 2014.[23]

---

PM), http://www.chicagotribune.com/news/local/breaking/ct-heroin-overdoses-met-20151002-story.html.

[16] *See* Margaret Warner et al., *Drugs Most Frequently Involved in Drug Overdose Deaths: United States, 2010-2014*, 65 Nat'l Vital Stats. Reps., no. 10, Dec. 20, 2016, at 1, 4, https://www.cdc.gov/nchs/data/nvsr/nvsr65/nvsr65_10.pdf.

[17] *Today's Heroin Epidemic*, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).

[18] *Id.*

[19] U.S. Dep't of Health and Human Servs., *The Opioid Epidemic: By the Numbers* 1 (2016), https://www.hhs.gov/sites/default/files/Factsheet-opioids-061516.pdf.

[20] *Today's Heroin Epidemic*, *supra* note 17.

[21] *Drug Overdose Deaths Hit Record Numbers in 2014*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/media/releases/2015/p1218-drug-overdose.html (last updated Dec. 18, 2015).

[22] *Understanding the Epidemic*, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/drugoverdose/epidemic/index.html (select "Heroin Use" tab) (last updated Dec. 16, 2016).

[23] Mark Motivans, U.S. Dep't of Justice, *Federal Justice Statistics, 2013–2014* 9 (2017), https://www.bjs.gov/content/pub/pdf/fjs1314.pdf.

In addition to heroin, there is a surge in the popularity of fentanyl and other powerful synthetic opioids.[24] The DEA estimates that "[a]bout two milligrams of fentanyl—about what comes out with a single jiggle of a salt shaker—is considered lethal."[25] Fentanyl and synthetic opioids are particularly dangerous because they can be—and often are—mixed with other drugs without the consumer's knowledge.[26] The

---

[24] Fentanyl is an extremely powerful synthetic opioid. It was originally introduced as an intravenous anesthetic in the 1960s. U.S. Dep't of Justice & Drug Enf't Admin. Diversion Control Div., *Fentanyl* (2016), http://www.deadiversion.usdoj.gov/drug_chem_info/fentanyl.pdf. Today, those with otherwise untreatable pain, such as terminal cancer patients, use fentanyl for pain management. *Id.* Fentanyl is 100 times more potent than morphine as an analgesic. *Id.; see also* David Armstrong, *"Truly Terrifying": Chinese Suppliers Flood US and Canada with Deadly Fentanyl*, STAT News (Apr. 5, 2016), https://www.statnews.com/2016/04/05/fentanyl-traced-to-china/. For opioid dependent individuals, fentanyl can serve as a direct substitute for heroin. U.S. Dep't of Justice & Drug Enf't Admin. Diversion Control Div., *supra.* However, because it is much more potent than heroin, fentanyl is a very dangerous replacement. *Id.* Fentanyl's use results in frequent overdoses, which can cause respiratory depression and death. *Id.* Additionally, because fentanyl can be absorbed through the skin in some forms, fentanyl can be deadly if touched. *Id.; see also FENTANYL: Incapacitating Agent,* Ctrs. For Disease Control & Prevention, https://www.cdc.gov/niosh/ershdb/EmergencyResponseCard_2975 0022.html (last updated May 19, 2017) (detailing necessary skin protection for handling fentanyl).

The DEA released a safety video to law enforcement agencies nationwide warning officers not to touch suspected fentanyl and not to test it in the field. The Justice Dep't, *Roll Call Video Warns About Dangers of Fentanyl Exposure*, YouTube (June 7, 2017), https://www.youtube.com/watch?v=8MLsrle GLSw. The DEA made the video in response to an incident where two police officers in New Jersey nearly died after accidentally inhaling a whiff of fentanyl while bagging it for evidence. *Id.*

[25] Lynh Bui & Peter Hermann, *Elephant Tranquilizer is the Latest Lethal Addition to the Heroin Epidemic*, Wash. Post (Apr. 26, 2017), http://wapo.st/2qcJqP1?tid=ss_tw&utm_term=.e179c3d288ca; *see also DEA Issues Carfentanil Warning to Police and Public*, U.S. Drug Enforcement Admin. (Sept. 22, 2016), https://www.dea.gov/divisions/hq/2016/hq092216.shtml (noting that fentanyl can "be lethal at the 2-milligram range, depending on route of administration and other factors" and that "[t]he dosage of fentanyl is a microgram, one millionth of a gram – similar to just a few granules of table salt").

[26] *Understanding the Epidemic, supra* note 22 (select "Heroin Use" tab); *see DEA Issues Carfentanil Warning to Police and Public, supra* note 25 ("Fentanyl, a synthetic opiate painkiller, is being mixed with heroin to increase its potency, but dealers and buyers may not know exactly what they are selling or ingesting. Many users underestimate the potency of fentanyl.").

Drug dealers may sell fentanyl pills disguised as other painkillers because prescription drugs fetch a higher price on the street, even though they are less potent than fentanyl. Armstrong, *supra* note 24.

Nine people died in Florida from taking counterfeit Xanax pills containing fentanyl. David Armstrong, *Dope Sick*, STAT News (Aug. 2, 2016), https://www.statnews.com/feature/opioid-crisis/dope-sick/. Authorities believe fentanyl pills made to resemble the painkiller hydrocodone caused a wave of overdoses last year in the Sacramento, California area that claimed nine lives. Press Release, Sacramento Cty. Dep't of Health & Human Servs., Update on Opioid-Related Overdoses (Mar. 30, 2016), http://www.dhhs.saccounty.net/Pages/NR-Update-on-Opioid-Related-Overdoses.aspx. Twelve

national overdose death rate from synthetic opioids increased 72.2% from 2014 to 2015.[27] Illegally made fentanyl is likely the driving force of this increase.[28] According to the National Forensic Laboratory Information System, state and local labs reported 942 fentanyl submissions from law enforcement in 2013 and 3,344 fentanyl submissions in 2014.[29] From 2013 to 2014, the CDC reported significant increases in overdose deaths involving fentanyl in several states.[30]

More dangerous opioids are being developed in order to meet growing demand. An example is furanyl fentanyl, a synthetic designer opioid, commonly referred to as

---

people in the area died in another outbreak just a month later after taking counterfeit Norco pills that contained fentanyl. Press Release, Sacramento Cty. Dep't of Health & Human Servs., Update on Opiod-Related Overdoses (May 4, 2016), http://www.dhhs.saccounty.net/Pages/NR-Update-on-opioid-related-related-overdoses-(May-4,-2016).aspx.

[27] *Synthetic Opioid Data*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/fentanyl.html (select "Synthetic Opioids Data" tab) (last updated Dec. 16, 2016); *see also* Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010-2015*, 65 Morbidity & Mortality Wkly. Rep. 1445, 1446 (2016).

[28] R. Matthew Gladden, *Fentanyl Law Enforcement Submissions and Increases in Synthetic Opioid–Involved Overdose Deaths — 27 States, 2013–2014*, 65 Morbidity & Mortality Wkly. Rep. 837, 840 (2016) ("Given the strong correlation between increases in fentanyl submissions (primarily driven by [illegally manufactured fenatyl]) . . . and increases in synthetic opioid . . . deaths (primarily fentanyl deaths), and uncorrelated stable fentanyl prescription rates, it is hypothesized that [illegally manufactured fentanyl] is driving the increases in fentanyl deaths. Findings from DEA state, and CDC investigations documenting the role of [illegally manufactured fentanyl] in the observed increases in fentanyl deaths further support this hypothesis."). The rate at which physicians prescribe fentanyl, however, has not increased. Rudd et al., *supra* note 27.

[29] *DEA Issues Nationwide Alert on Fentanyl as Threat to Health and Public Safety*, U.S. Drug Enforcement Admin. (Mar. 18, 2015), https://www.dea.gov/divisions/hq/2015/hq031815.shtml.

[30] *Increases in Fentanyl Drug Confiscations and Fentanyl-Related Overdose Fatalities*, Ctrs. for Disease Control & Prevention (Oct. 26, 2015 8:15 AM), http://emergency.cdc.gov/han/han00384.asp (noting that fentanyl-related overdose deaths rose from 92 to 514 in Ohio, 58 to 185 in Maryland, and 185 to 397 in Florida).

"China White."[31] Furanyl fentanyl can be up to 100 times more potent than heroin.[32] Its effects last longer, and an overdose is more difficult to treat than one caused by heroin alone.[33] Traditional naloxone treatment is often not enough.[34] Laboratory analysis confirmed furanyl fentanyl in Mr. Walker's July 12, 2016 controlled buy.

Another synthetic opioid on the rise is carfentanil, a drug lawfully used to sedate elephants and other large animals.[35] It is an even more potent version of fentanyl often used to "lace" heroin.[36] Carfentanil is 10,000 times more potent than morphine.[37] Because of carfentanil's tremendous potency, it poses a tremendous risk to users and first responders who inadvertently come into contact with the drug in the course of their duties.[38]

The heroin and opioid epidemic is one of the great public health problems of

---

[31] Annamarya Scaccia, *"China White": What You Need to Know About Heroin-Like Drug*, Rolling Stone (Apr. 3, 2017), http://www.rollingstone.com/culture/china-white-what-you-need-to-know-about-heroin-like-drug-w474670. It is often a mixture of fentanyl, cocaine, and residual heroin. Dealers who try to manufacture fentanyl at home often end up with furanyl fentanyl due to contamination during the synthesis process. *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] Andrew Joseph, *26 Overdoses in Just Hours: Inside a Community on the Front Lines of the Opioid Epidemic*, STAT News (Aug. 22, 2016), https://www.statnews.com/2016/08/22/heroin-huntington-west-virginia-overdoses/.

According to Melvin Patterson, a spokesperson for the DEA, all of the zookeepers and veterinarians in the United States combined need only about eighteen grams—the weight of eighteen sugar packets—per year. Bui & Hermann, *supra* note 25.

[36] *DEA Issues Carfentanil Warning to Police and Public*, *supra* note 25.

[37] Wendy Holdren, *Although Overdose Deaths Up, WV Health Officer Cautiously Optimistic About Future*, The Register-Herald (Mar. 7, 2017), http://www.register-herald.com/news/although-overdose-deaths-up-wv-health-officer-cautiously-optimistic-about/article_eb38b7df-09b3-52ac-b3a0-4811c2347f62.html.

[38] Sheryl Krieg, *Carfentanil a New Worry for First-Responders*, Emergency Mgmt. (May 11, 2017), http://www.govtech.com/em/disaster/Carfentanil-New-Worry-for-First-Responders.html.

our time. The CDC found that opioids, primarily prescription pain relievers and heroin, are the chief drugs associated with overdose deaths.[39] In 2015, the most recent year for which data is available, opioids were involved in 33,091 deaths,[40] which is more than 63% of all drug overdose deaths.[41] On average, ninety-one Americans die from an opioid overdose every day.[42] Preliminary numbers for 2016 suggest that overdose deaths are growing at a rate comparable to the rate of H.I.V.-related deaths at the height of the H.I.V. epidemic.[43]

In a November 2016 report, the DEA referred to opioid prescription drugs, heroin, and fentanyl as the most significant drug-related threats to the United States.[44] Indeed, opioid overdoses have quadrupled nationally since 1999.[45] According to the CDC, the significant increase in overdose death rates is attributable to synthetic opioids such as heroin and fentanyl.[46]

These drugs are far more dangerous and far more available for abuse. Opioids

---

[39] Rudd, et al., *supra* note 27, at 1445–46.

[40] *Drug Overdose Death Data*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/statedeaths.html (last updated Dec. 16, 2016). To put this in perspective, 58,220 U.S. service members died in the Vietnam conflict. *Stat. Info. About Casualties of the Vietnam War*, Nat'l Archives, https://www.archives.gov/research/military/vietnam-war/casualty-statistics.html (last accessed June 26, 2017). This means that every two years we are losing more Americans to opioid overdose deaths than we did in the entire time fighting in Vietnam.

[41] Rudd, et al., *supra* note 27, at 1445–46.

[42] *Understanding the Epidemic*, *supra* note 22 (select "Record Overdose Deaths" tab).

[43] Robert Anderson, the CDC's Chief of Mortality Statistics Branch, stated that the trend is similar to the H.I.V. epidemic death rates during the late 1980s and early 1990s. Haeyoun Park & Matthew Bloch, *How the Epidemic of Drug Overdose Deaths Ripples Across America*, N.Y. Times (Jan. 19, 2016), https://www.nytimes.com/interactive/2016/01/07/us/drug-overdose-deaths-in-the-us.html.

[44] Rudd, et al., *supra* note 27, at 1450.

[45] This statistic includes all overdoses, not only those that resulted in death. *Drug Overdose Death Data*, *supra* note 40.

[46] Rudd, et al., *supra* note 27.

are in the medicine cabinets of homes all over America and are available at every hospital and doctor's office. With the rise of prescription opioid abuse,[47] heroin, which up until recently had been a tiny fraction of the illicit drug trade, came roaring back.[48] The return of that pale horse[49] may prove to be the event horizon of drug abuse and addiction.

## ii.  West Virginia's Epidemic

West Virginia has the highest rate of fatal drug overdoses in the nation—and that rate continues to rise.[50] This past year, 86% of overdose deaths involved at least one opioid.[51] From 2001 to 2016, the number of people in the state who died from a drug overdose increased 400%.[52] Our state's fatal drug overdose rate was 41.5 per 100,000 people in 2015,[53] far above the national average of 16.3 per 100,000 people.[54] The West Virginia Health Statistics Center released information that showed that at

---

[47] The CDC estimates that approximately three out of four new heroin addicts in the United States started by abusing prescription opioids. *Heroin Overdose Data*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/heroin.html (select "Heroin Data" tab) (last updated Jan. 26, 2017).

[48] According to the CDC, opioids are responsible for the majority of drug overdose deaths today. *Understanding the Epidemic*, *supra* note 22 (select "Record Overdose Deaths" tab).

[49] *See Revelation* 6:8 (King James) ("And I looked, and behold a pale horse: and his name that sat on him was Death, and Hell followed with him. And power was given unto them over the fourth part of the earth, to kill with sword, and with hunger, and with death, and with the beasts of the earth.").

Heroin is occasionally called "horse" or "white horse." *See Heroin*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/drugs-abuse/heroin (last updated May 2016).

[50] Joseph, *supra* note 35; Beth Vorhees, *Drug Treatment and Addiction Solutions Next Story for Pulitzer Prize Winning Reporter*, W. Va. Morning (Apr. 12, 2017), http://wvpublic.org/post/drug-treatment-and-addiction-solutions-next-story-pulitzer-prize-winning-reporter#stream/0.

[51] *Overdose Deaths Continue to Rise in State,* TriStateUpdate (Mar. 22, 2017), http://www.tristateupdate.com/story/34692964/overdose-deaths-continue-to-rise-in-state.

[52] *Id.*

[53] *Drug Overdose Death Data*, *supra* note 40.

[54] Rudd, et al., *supra* note 27, at 1445.

least 844 people in the state died of drug overdoses in 2016,[55] an increase of 16.9%
from 2015 to 2016.[56]

The rate of drug overdose deaths involving synthetic opioids in West Virginia
increased 76.4% from 2014 to 2015.[57] In just the last three years, fentanyl use has
increased tenfold in West Virginia.[58] The vast majority of patients at the Addiction
Program at West Virginia University Hospitals are treated for heroin.[59] Along with
Massachusetts, New Hampshire, Ohio, and Rhode Island, West Virginia experienced
the largest absolute rate change in death from synthetic opioids.[60]

The Southern District of West Virginia has been hit especially hard. Last
August, twenty-six people overdosed during a four-hour span in Huntington.[61]
National press reporters quote local health officials as estimating that one in four
Huntington residents abuses heroin or some other opioid,[62] meaning that
approximately 12,000 people are dealing with opioid addiction[63] in a town of 50,000

---

[55] Eric Eyre, *WV Drug OD Deaths Soared Above 840 in 2016*, Charleston Gazette-Mail (Mar. 22, 2017), http://www.wvgazettemail.com/news/20170322/wv-drug-od-deaths-soared-above-840-in-2016.

[56] *Drug Overdose Death Data*, *supra* note 40.

[57] *Synthetic Opioid Data*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/fentanyl.html (last updated Dec. 16, 2016).

[58] Vorhees, *supra* note 50.

[59] David Gutman, *How Did WV Come to Lead the Nation in Overdoses?*, Charleston Gazette-Mail (Oct. 17, 2015), http://www.wvgazettemail.com/article/20151017/GZ01/151019539.

[60] Rudd, et al., *supra* note 27.

[61] Joseph, *supra* note 35.

[62] Wayne Drash & Max Blau, *In America's Drug Death Capital: How Heroin is Scarring the Next Generation*, CNN (Sept. 16, 2016), http://www.cnn.com/2016/09/16/health/huntington-heroin/.

[63] *Id.*

people.[64] In April, a pregnant mother in Charleston overdosed at ten o'clock on a Wednesday morning, killing both herself and her unborn baby.[65] No one is immune from the epidemic.

West Virginia leads the nation in the incidence of babies born exposed to drugs[66] and has the highest rate of babies born dependent on opioids.[67] In Huntington, for example, one in ten babies born at the hospital suffers withdrawal from substances such as heroin, opiates, cocaine, or alcohol.[68] That is about fifteen times the national average.[69]

The heroin and opioid crisis in our state implicates the general welfare in a preeminent way. Public safety is the purpose of the criminal justice system. The seriousness of this crisis in West Virginia convinces me that I should carefully scrutinize plea agreements that bargain away multi-count grand jury indictments. Grand jurors are members of our community who have, under their oaths, investigated, and determined that there is probable cause that certain crimes have been committed by the defendant named in the indictment.

---

[64] Tom Bateman, et al., *The Heroin-Ravaged City Fighting Back*, BBC (May 3, 2016), http://www.bbc.com/news/av/world-us-canada-39343289/the-heroin-ravaged-city-fighting-back.

[65] Joseph Fitzwater, *Pregnant Mother and Baby Die After Charleston Heroin Overdose*, TriStateUpdate (Apr. 26, 2017), http://www.tristateupdate.com/story/35259779/pregnant-mother-and-baby-die-after-charleston-heroin-overdose.

[66] Holdren, *supra* note 37.

[67] Joseph, *supra* note 35.

[68] Drash & Blau, *supra* note 62.

[69] *Id.*

### d.    Plea Agreements

Before discussing the plea agreement in this case, I will briefly look at the history of the practice of plea bargaining in the federal courts.

Up until the nineteenth century, plea bargaining was not a regular or visible part of the criminal justice system.[70] Prior to the Civil War, the general judicial practice was to discourage guilty pleas.[71] The proffered explanation for the emergence of plea bargaining was a rising crime rate, limitations of local law enforcement resources, and busy dockets.[72] Since 1908, the first year that federal court statistics are available, the rate of guilty pleas has continued to rise.[73] However, it was not until 1971 that the Supreme Court legitimized plea bargaining in *Santobello v. New York*.[74]

The national implementation of the mandatory United States Sentencing Guidelines in 1989 encouraged the plea bargaining process by shifting a large portion of sentencing decision-making, historically reserved for the judge, to the prosecutor.[75]

---

[70] *See generally* Albert W. Alschuler, *Plea Bargaining and Its History*, 79 Colum. L. Rev. 1 (1979). Before the nineteenth century, other types of bargaining practices existed such as "compounding." Compounding was the practice of paying the victim of a crime in exchange for the agreement not to prosecute. *Id.* at 5. It was not until after 1865 that plea bargaining made its way into appellate court reports. *Id.* at 19.

[71] *See id.* at 5–12 (explaining why guilty pleas were generally discouraged).

[72] *Id.* at 17.

[73] *See infra* pp. 18–23 (offering a more detailed statistical analysis of the rise of plea bargaining).

[74] *See Santobello v. New York*, 404 U.S. 257, 260–61 (1971).

[75] *See Mistretta v. United States*, 488 U.S. 361, 412 (1989); Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. Pa. L. Rev. 79, 129–132 (2005) ("The federal guidelines changed more than the size and certainty of the trial penalty: they also changed who controls the penalty. Whereas the judge and the prosecutor once competed for control over the rewards for pleading guilty, the sentencing guidelines, operating in a high volume system, shifted more of this control away from the judge and toward the prosecutor.").

Prosecutors could use adjustments[76] and departures[77] as incentives to persuade defendants to accept plea agreements.[78]

Proponents of plea bargaining have long relied on "practical reasons" as justifications for the practice.[79] Prominent among these advantages are assertions of cost effectiveness, efficiency, certainty, and reduction in the burden on the court system.[80] The most commonly cited justifications are docket pressure and overburdened prosecutors and judges.[81] I am juberous of these assertions. As I detail herein, although widely accepted, the "overburdened" justification for plea bargaining is empirically unsupported.[82] I agree with Judge Jennifer Walker Elrod, Circuit Judge for the United States Court of Appeals for the Fifth Circuit, who has stated: "[W]e must strive to correct any public misconception that the courts are overworked

---

[76] *See, e.g.*, U.S. Sentencing Guidelines Manual § 3E1.1 (U.S. Sentencing Comm'n 2016) (outlining the acceptance of responsibility adjustment).

[77] *See, e.g.*, *id.* at § 5K1.1 (outlining the substantial assistance to authorities departure).

[78] Wright, *supra* note 75, at 138–39 ("Patterns of outcomes in the districts reveal some of the particular sentencing laws that have contributed most clearly to the drop in acquittals over the last decade. Departures from the sentencing guidelines based on a defendant's 'substantial assistance' made a measurable difference. The same was true of the three-level 'super acceptance of responsibility' discount. Where these methods—largely controlled by prosecutors—were used most commonly, they contributed to an environment in the district that convinced defendants to plead guilty and to opt out of trials that might have ended in acquittals. More generally, the prosecutor's willingness to decrease the offense level under the guidelines resulted in more guilty pleas and fewer acquittals.").

[79] *How Courts Work*, A.B.A., http://www.americanbar.org/groups/public_education/resources/law_related_education_network/how_courts_work/pleabargaining.html (last visited June 26, 2017).

[80] *Id.*

[81] *See, e.g.*, William J. Stuntz, *Plea Bargaining and Criminal Law's Disappearing Shadow*, 117 Harv. L. Rev. 2548, 2555–56 (2004).

[82] *See infra* pp. 18–23.

and backlogged. . . . [W]hen the myth of backlogged courts is raised as a reason for forsaking the jury, we must correct them."[83]

## III.    DISCUSSION

The United States Constitution makes plain that the United States is a participatory democracy. This is a government of the people and by the people. Each of the three branches of government depend upon and require the active participation of the people in the exercise of power.[84]

The exigencies of a changing world have required acceptance of processes that are more streamlined than those contemplated by our Founding Fathers.[85] Plea bargaining is one such process that we have come to embrace. Plea bargaining eliminates the jury and conflates the judge's and prosecutor's roles, creating an

---

[83] Hon. Jennifer Walker Elrod, *W(h)ither the Jury? The Diminishing Role of the Jury Trial in Our Legal System*, 68 Wash. & Lee L. Rev. 3, 22 (2011).

[84] *See* Jackie Gardina, *Compromising Liberty: A Structural Critique of the Sentencing Guidelines*, 38 U. Mich. J.L. Reform 345, 381 (2005) ("Creating a voice for the people in the Judicial Branch was also entirely consistent with the Framers' attempts to create a government for the people and by the people. The Framers created a structure in which the Executive and Legislative Branches represented the people and were accountable to them. Given the Framers' desire to create a system in which the people dominated the political landscape, it would be odd if they excluded the people from the Judicial Branch—the only unelected branch, and the branch that had the ultimate say in 'what the law is.'").

[85] *See* Darryl K. Brown, *The Perverse Effects of Efficiency in Criminal Process*, 100 Va. L. Rev. 183, 211–213 (2014) (discussing how the "pervasive adoption of adjudication strategies in service of efficiency, especially plea bargaining, helps to redefine the norms that inform both ideas of adjudication's purposes and, more broadly, those that influence the state's policies of criminal law enforcement") ("The jury has long been explained and defended with reference to its constitutive role in democratic governance and the political value of lay participation (including the benefit of jury service to jurors themselves as citizens), in addition to consequentialist functions such as a check on government power. The Supreme Court has been quite explicit about the criminal jury's non-utilitarian normative roles, including its presumed disposition to rest verdicts as much on moral assessments as on logic, formal proof, and 'any linear scheme of reasoning.' . . . These long-established accounts of juries and the nature of judgments implicitly embrace a reality that efficiency-dominated accounts of adjudication ignore: Adjudication plays a constitutive role in substantive justice.").

administrative system of criminal justice.[86] A species of trial does indeed occur, but it occurs in "the shadow of guilty pleas" rather than in open court.[87]

Without question, resolution of criminal charges by plea bargaining has replaced resolution by jury trial.[88] I concede that plea bargaining is an efficient and convenient system and that public participation in government is inherently inconvenient. Governance by decree is expedient. However, the Founding Fathers intended the wheels of justice to grind slowly and exceedingly fine in order to discern the truth.[89]

In 1908, about 50% of all federal criminal convictions were obtained by a guilty plea.[90] By 1916, the rate had risen to 72%, and by 1925, guilty pleas represented nearly 90% of all convictions.[91] In 1993, the rate of guilty pleas was 88.5%.[92] That

---

[86] Rachel Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1048 (2006).

[87] Ronald Wright & Marc Miller, *Honesty and Opacity in Charge Bargains*, 55 Stan. L. Rev. 1409, 1415 (2003).

[88] *See infra* notes 90–95 and accompanying text; *see also infra* Figure 1.

[89] Trial by jury is one of the mechanisms of justice ensuring that the wheels grind slowly and finely.

> If we fail to purposefully guard and defend the jury, we risk losing one of America's greatest traditions and protectors of our liberty—the indispensable barrier between the liberties of the people and the prerogatives of the government. We should always remember that inconveniences suffered by the jury trial pale in comparison to the lamentable loss of freedom and justice that would accompany the elimination of this institution.

Elrod, *supra* note 83, at 22.

[90] Alschuler, *supra* note 70, at 27.

[91] *Id.*

[92] U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* 20 (1997), http://www.ussc.gov/research/sourcebook/archive/sourcebook-1997 (showing guilty plea and trial data in Figure C for fiscal years 2012–2015).

number increased to 97.1% in 2015 with a criminal trial rate of only 2.9%.[93] Data provided by the Administrative Office of the United States Courts ("AO") further confirms that the number of criminal defendants terminated by trial has decreased significantly since 1970.[94] In fiscal year ("FY") 1973, the judiciary completed 8,529 criminal trials, but in FY 2016, the judiciary completed 1,859 criminal trials.[95]

In the Southern District of West Virginia, there have been only eighteen criminal trials since January 2013. There have only been five criminal opioid trials in this district during that time. From 2014 to 2017, there were less than 250 individual drug sentences handed down by all of the judges of this court. The last heroin case in this district tried to verdict was in 2014.[96]

For at least the past forty-six years, the primary justification for plea bargaining has been that the constitutional process of requiring trial by jury in every case overburdens the courts and overworks the prosecutors.[97] I believe these

---

[93] U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* S-23 (2016), http://www.ussc.gov/research/sourcebook-2016 (showing guilty plea and trial data in Figure C for fiscal years 2012–2015).

[94] *See infra* Figures 1, 2, & 3. The AO data is derived from tables in the AO Judicial Business reports and from the internal NewSTATS system. The data excludes petty offense cases heard before Magistrate Judges and includes a small number of petty offense cases heard before Article III Judges. From 1970 to 1991, the data uses a fiscal year ending on June 30; from 1992 to 2016, the data uses a fiscal year ending on September 30. The data represents individual defendants tried rather than "cases" tried; many cases include multiple defendants tried at different times. The data covers only criminal trials, not civil trials.

[95] *See supra* note 94.

[96] Statistics for the Southern District of West Virginia were calculated using internal data provided by the Clerk's Office.

[97] In 1971, the Supreme Court encouraged the use of plea bargaining, where "[p]roperly administered," in order to promote judicial economy. *Santobello v. New York*, 404 U.S. 257, 260 (1971). The Court noted, "[i]f every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities." *Id.*

justifications, and others, diminish the right of the people to participate in the administration of the criminal justice system to a near vanishing point. We now resolve almost every criminal case by a process that is no longer justified by the circumstances making it acceptable in the first place. The courts are no longer overburdened. Federal prosecutors are no longer overworked. To illustrate, despite the decline in criminal trials, the number of federal prosecutors has steadily increased since 1970.[98] According to the Annual Statistical Reports ("ASRs") published by the Executive Office for United States Attorneys, between FY 1970 and FY 2010, the average number of federal prosecutors increased more than sevenfold—from 809 in 1970 to 6,075 in 2010.[99] In FY 2016, the number of federal prosecutors had grown to 6,293.[100]

---

[98] *See infra* Figure 1.

[99] Exec. Office for U.S. Attorneys, U.S. Dep't of Justice, *Annual Statistical Report: Fiscal Year 2010* 2 (2010), https://www.justice.gov/usao/resources/annual-statistical-reports; Exec. Office for U.S. Attorneys, U.S. Dep't of Justice, *Annual Statistical Report: Fiscal Year 1970* 6–7, chart 14, tbl.6 (1970), https://www.justice.gov/usao/resources/annual-statistical-reports.

[100] Including reimbursable attorneys. *See* U.S. Dep't of Justice, *FY 2017 Budget and Performance Summary*, https://www.justice.gov/about/fy-2017-budget-and-performance-summary (select link for "U.S. Attorneys (USA)") (last updated Aug. 29, 2016). I use the FY 2017 budget request data, which shows the positions authorized plus reimbursable full time employees in the FY 2016 enacted budget, because the ASRs do not currently show staffing levels past 2010.



Criminal Trials & Average Attorneys or Full Time Employees Employed by U.S. Attorneys per Fiscal Year

Given the inverse relationship between trials and federal prosecutors, there has been a steady decrease in the average number of criminal trials handled per federal prosecutor.[101] In FY 1973, each federal prosecutor handled over eight criminal trials on average. By FY 2016, the average number of criminal trials handled by each federal prosecutor plummeted to 0.29 trials.

---

[101] *See infra* Figure 2. Figure 2 shows the average number of criminal trials per attorney employed by the U.S. Attorneys per fiscal year between 1970 and 2016. The AO trial data, ASR staffing data, and budget request staffing data were used to create Figure 2.

FIGURE 2:



Average Criminal Trials per Attorney
Employed by U.S. Attorneys per Fiscal Year

FY 1973,
8.06 Trials

FY 2016,
0.29 Trials

FIGURE 3:



Average Criminal Trials per
Authorized Article III District Judgeship per Fiscal Year

FY 1973,
21.65 Trials

FY 2016,
2.79 Trials

It is no surprise that the judiciary has also experienced a decreased criminal trial load.[102] Like federal prosecutors, the number of authorized Article III district court judgeships rose from 394 in 1970 to 663 in 2015.[103] Accordingly, the number of criminal trials handled per district judgeship dropped from over twenty-one per year in 1973 to fewer than three per year in 2016.[104] Thus, like federal prosecutors, district court judges are not overburdened by trials.

Because the most common justifications for plea bargaining no longer have any substantial heft, the counterweight of the people's general interest in observing and participating in their government requires close consideration of a proffered plea bargain in every case.

I conclude that courts should reject a plea agreement upon finding that the plea agreement is not in the public interest.[105] There is no justice in bargaining against the people's interest.

---

[102] *See supra* Figure 3. Figure 3 shows the average number of criminal trials per authorized Article III district judgeship between 1970 and 2016. The AO trial data and an AO report on authorized judgeships were used to create Figure 3. *See* Admin. Office of the U.S. Courts., *Authorized Judgeships* 1–8 (2016), http://www.uscourts.gov/file/document/all-authorized-judgeships-1789-present.

[103] These numbers exclude district judgeships for U.S. territories and temporary authorizations. *See* Admin. Office of the U.S. Courts., *supra* note 102.

[104] *See supra* Figure 3. This data does not account for the increasing number of magistrate judges and senior district judges. *See* Admin. Office of the U.S. Courts., *Judicial Facts and Figures Table 1.1* (Sept. 30, 2015), http://www.uscourts.gov/statistics/table/11/judicial-facts-and-figures/2015/09/30; Admin. Office of the U.S. Courts., *supra* note 102. Were I to include these additional judges, the number of criminal trials per judge would be even lower.

[105] Several circuit courts have approved consideration of the public interest in accepting or rejecting a plea agreement. The Ninth Circuit has stated, "a district court properly exercises its discretion when it rejects a plea agreement calling for a sentence the court believes is too lenient or otherwise not in the public interest in light of the factual circumstances specific to the case." *In re Morgan*, 506 F.3d 705, 712 (9th Cir. 2007) (internal quotations omitted). The Tenth Circuit has stated, "[w]hile '[t]he procedures of Rule 11 are largely for the protection of criminal defendants . . . Rule 11 also contemplates the rejection of a negotiated plea when the district court believes that bargain is too lenient, or otherwise not in the public interest.'" *United States v. Carrigan*, 778 F.2d 1454, 1462 (10th Cir. 1985) (quoting *United States v. Miller*, 722 F.2d 562, 563 (9th Cir. 1983)). The Fifth Circuit has

First, a court should consider the cultural context surrounding the subject criminal conduct. Here, that cultural context is a rural state deeply wounded by and suffering from a plague of heroin and opioid addiction.[106]

Second, the court should weigh the public's interest in participating in the adjudication of the criminal conduct charged by the indictment. The criminal jury trial is "fundamental to the American scheme of justice"[107] and effectively promotes a motivated and educated populace that respects the law, holds faith in the judicial system, and is deterred from participating in crime.[108] Jury trials serve the people's right to be informed as to what occurs in their courts and reinforce the fact that the law comes from the people.[109] Here, the public has a high interest in the adjudication of heroin and opioid crimes such as these because of the severity of the crisis occurring in our state. Education about and deterrence of heroin and opioid crimes is of paramount importance at this time.

---

commented, "[i]f the court did not have discretion to refuse a plea bargain because the agreement is against the public interest in giving the defendant unduly favorable terms, [Rule 11(e)(2) allowing deferral of acceptance to sentencing] would be largely unnecessary." *United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977). The First Circuit has stated as a reason why the court must have discretion whether or not to accept a plea "that a conviction affects more than the court and the defendant; the public is involved." *United States v. Bednarski*, 445 F.2d 364, 366 (1st Cir. 1971).

[106] *See supra* Section II.c.

[107] *Duncan v. Louisiana*, 391 U.S. 145, 149 (1930).

[108] *See* Eang Ngov, *Judicial Nullification of Juries: Use of Acquitted Conduct at Sentencing*, 76 Tenn. L. Rev. 235, 301 (2009); Robert Lloyd Raskopf, *A First Amendment Right of Access to a Juror's Identity: Toward a Fuller Understanding of the Jury's Deliberative Process*, 17 Pepp. L. Rev. 357, 360 (1990). *See generally* George C. Harris, *The Communitarian Function of the Criminal Jury Trial and the Rights of the Accused*, 74 Neb. L. Rev. 804, 806–10 (1995).

[109] The Supreme Court recognized in *Gannett Co. v. DePasquale*, that "the public has the right to be informed as to what occurs in its courts. . . . 'The suggestion that there are limits upon the public's right to know what goes on in the courts causes . . . deep concern.'" 443 U.S. 368, 413 (1979) (Blackmun, J., concurring in part and dissenting in part) (quoting *Estes v. Texas*, 381 U.S. 532, 541, 614–15 (1965)).

Third, the court should consider whether "community catharsis can occur" without the transparency of a public jury trial.[110] "Much like the lid of a tea kettle releases steam, jury trials in criminal cases allow peaceful expression of community outrage at arbitrary government or vicious criminal acts."[111] The crimes alleged in Mr. Walker's indictment involve heroin and other opioids and are "vicious criminal acts."

Fourth, the court should examine the plea agreement and, in light of the presentence report, determine whether the apparent motivation is to advance justice or, more probably, to expediently avoid trial. Here, the agreement trades a grand jury indictment charging three counts of distributing heroin, two counts of distributing fentanyl, and one count of being a felon in possession of a firearm for an information charging one count of distributing heroin. The principal motivation appears to be convenience.

Upon full consideration of each of these factors, I **FIND** that the plea agreement is not in the public interest, and I **REJECT** the plea agreement.

## IV. CONCLUSION

My twenty-two years of imposing long prison sentences for drug crimes persuades me that the effect of law enforcement on the supply side of the illegal drug market is insufficient to solve the heroin and opioid crisis at hand. I also see scant

---

[110] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571 (1980) ("The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is done in a corner [or] in any covert manner.").

[111] *United States v. Lewis*, 638 F. Supp. 573, 580 (W.D. Mich. 1986) (holding that community input through a jury trial is not an overriding or compelling governmental interest to burden the defendant's free exercise of religion).

evidence that prohibition is preventing the growth of the demand side of the drug market. Nevertheless, policy reform, coordinated education efforts, and expansion of treatment programs are not within my bailiwick. I may only enforce the laws of illicit drug prohibition.

The law is the law, and I am satisfied that enforcing the law through public adjudications focuses attention on the heroin and opioid crisis. The jury trial reveals the dark details of drug distribution and abuse to the community in a way that a plea bargained guilty plea cannot. A jury trial tells a story. The jury members listening to the evidence come away with personally impactful information about the deadly and desperate heroin and opioid crisis existing in their community.[112] They are educated in the process of performing their civic duty and are likely to communicate their experience in the courtroom to family members and friends.[113] Moreover, the attendant media attention that a jury trial occasions communicates to the community that such conduct is unlawful and that the law is upheld and enforced.[114] The

---

[112] *See* Harris, *supra* note 108, at 107–08 (defining the communitarian function of the jury trial as "1) a vehicle for direct community participation in the criminal justice system; 2) a means by which the community is educated regarding the criminal justice system; and 3) a ritual by which the faith of the community in the administration of justice is maintained").

[113] *See id.* at 106–10.

[114] *See Richmond Newspapers*, 448 U.S. at 572–73 ("Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public."). Judge Richard Posner, Circuit Judge for the United States Court of Appeals for the Seventh Circuit, the leading authority on deterrence theory, says that "[l]aw must . . . be public. . . . A threat that is not communicated cannot deter." Richard A. Posner, *Economic Analysis of Law* 318 (9th ed. 2014). It is clear to me that "consequences that are unknown to potential offenders cannot affect their behavior." Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 190 (2003).

communication of a threat of severe punishment acts as an effective deterrent.[115] As with other criminalized conduct, the shame of a public conviction and prison sentence specifically deters the sentenced convict from committing the crime again—at least for so long as he is imprisoned.[116]

Over time, jury verdicts involving the distribution of heroin and opioids reinforce condemnation of the conduct by the public at large. In turn, respect for the law propagates.[117] This respect for the law may eventually reduce such criminal conduct.

The secrecy surrounding plea bargains in heroin and opioid cases frequently undermines respect for the law and deterrence of crime. The bright light of the jury trial deters crime, enhances respect for the law, educates the public, and reinforces their sense of safety much more than a contract entered into in the shadows of a private meeting in the prosecutor's office.

For the reasons stated, I **REJECT** the plea agreement.

---

[115] In fact, compared to the criminal code, a public trial serves as a more effective deterrent to criminal behavior because it better transfers knowledge of legal sanctions to the citizenry. *See* Dru Stevenson, *Toward A New Theory of Notice and Deterrence*, 26 Cardozo L. Rev. 1535, 1540–41 (2005) (discussing how the language of the criminal code is inadequate to cure the "information gap" and how violent crime rates decreased noticeably in jurisdictions following well publicized executions); *see also supra* note 114.

[116] *See* Laura I. Appleman, *The Lost Meaning of the Jury Trial Right*, 84 Ind. L.J. 397, 404 (2009) (discussing *Blakely v. Washington*, 542 U.S. 296 (2004), and noting that "*Blakely* contended the liberal, democratic decision making vested in the jury's determination of blameworthiness relied on the community's role in linking punishment to the crime committed, so that the offender would feel more responsibility for her actions"); *see also Blakely*, 542 U.S. at 309.

[117] *See Richmond Newspapers*, 448 U.S. at 570–72 (recognizing that a public trial has "significant community therapeutic value" because transparency reaffirms the public's perception of stability and security, and that openness of criminal trials increases respect for the law by educating the public about the criminal justice system).

ENTER:     June 26, 2017

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE